# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MARKET AMERICA, )
 )
          Plaintiff, )
 )
          v. ) 1:07CV00855
 )
OPTIHEALTH PRODUCTS, INC. and )
RUSSELL DICKSON, )
 )
          Defendants. )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF MAGISTRATE JUDGE ELIASON

The Plaintiff in this action is Market America, a North Carolina corporation. Defendant Optihealth Products, Inc. ("Optihealth") is a New York corporation, with its principal place of business in that State. Defendant Russell Dickson is alleged by Plaintiff to be the Chairman or Chief Executive of Optihealth and a citizen of New York. Plaintiff asserts Defendants (1) violated section 43(a) of the Lanham Act, 15 U.S.C. § 1114, et seq., by unauthorized use of trademarks similar to Plaintiff's, (2) cybersquatted in violation of 15 U.S.C. § 1125(d), (3) violated the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C.G.S. § 75-1.1, et seq., and (4) committed common law unfair competition. The only matter presently before the Court is Defendants' motion to dismiss for lack of personal jurisdiction over them in the State of North Carolina.

## Facts

Plaintiff sells various food supplements under its "ISOTONIX" line of products. One of these is "OPC-3." Both terms are registered trademarks, as are "OPC-3 ISOTONIX," "UNFRANCHISE" and "MARKET AMERICA." This supplement contains antioxidants called oligomeric proanthocyanidins which are derived from grape seed, pine bark, and red wine, among other sources.

Plaintiff began selling and promoting "OPC-3" in 1994 and alleges that it has a strong reputation among consumers. It maintains a website for marketing the product and another website to sell websites to its independent distributors. It has about 100,000 independent distributors located throughout the United States.

From both the complaint and the affidavit of Defendant Dickson in support of the motion to dismiss, the following facts appear. Defendant Optihealth markets food supplements bearing its trademark "OPCXtra" on a website under the url "www.OPCXtra.com," which web address is owned by Defendant Optihealth. Defendant Dickson also has purchased the domain name "www.opc3.com." The acronym "OPC" defines a group of antioxidant bioflavonoids called oligomeric proanthocyanidins, and is a generic descriptive term. (Docket No. 6, Dickson Aff. ¶ 6.) Defendant Optihealth has not used the trademark "OPC-3" or any variant thereof in a customer viewable portion of its website, other than with respect to comparative advertising between Optihealth's product and Plaintiff's. On the

-2-

other hand, Defendant has placed metatags, and specifically the term "OPC-3" in the underlying computer code of its website. It has also purchased "Sponsored Links" from Google, Inc. for use with the search engine, so that if a person searched for "OPC" or "OPC3," "ISOTONIX," or "MARKET AMERICA," the person would be directed to Defendant's OPCXtra website. Defendant also maintains ownership of the domain name "www.opc3.com," which provides conspicuous links for customers to purchase Defendants' OPCXtra product.

Defendants show that neither one maintains offices or has employees in North Carolina. Nor have they conducted advertising business directed to the residents of North Carolina. Defendants maintain, without challenge from Plaintiff, that neither Defendant owns or leases property in the State of North Carolina and that Defendant Dickson has no independent role in the activities with respect to contacting North Carolina, aside from being an officer and director of Defendant Optihealth. It is not clear what role Defendant Dickson takes with respect to managing the company, but it is clear that he has taken an active, personal interest in the controversy before the Court. This is because he personally "maintain[s] ownership of the domain name "www.opc3.com." Moreover, this site is then used to promote his company's products. Thus, for purposes of this action, the individual officer has stepped beyond the bounds of ordinary employee action and behavior and taken steps of a personal nature in conjunction with his

company. Thus, as will be seen, the two Defendants stand together in this case.

It is not clear whether Defendant Optihealth conducts most of its sales through the Internet, but it has conducted significant sales through its interactive website. These sales covered sales inside and outside the United States. In the last five years, Defendant has obtained $37,154.40 from its "OPCXtra" sales in North Carolina, which constitute 2.83% of its revenue. The greatest percentage of sales were made in the State of California, 12.9%. In the State of New York, Defendant's sales were 7.24%.

## Discussion

### I. Motion to Dismiss

When a defendant files a motion to dismiss claiming lack of personal jurisdiction over it, the plaintiff bears the burden of establishing personal jurisdiction as to each defendant. Wilson v. Wilson-Cook Medical, Inc., 720 F. Supp. 533, 536 (M.D.N.C. 1989). In order to establish personal jurisdiction in a diversity of citizenship case, the plaintiff must show that the state's long-arm statute provides jurisdiction and that such jurisdiction satisfies the federal due process standards found in the Fourteenth Amendment of the United States Constitution. Christian Science Bd. of Directors of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001); Ellicott Mach. Corp., Inc. v. John Holland Party, Ltd., 995 F.2d 474 (4th Cir. 1993). Due process concerns are satisfied when a defendant has minimum contacts with

the forum state so that defending a lawsuit there does not offend traditional notions of fair play and substantial justice. Helicopteros Nacionales de Colombia, S.A. V. Hall, 466 U.S. 408, 414 (1984)(quoting International Shoe Co. v. State of Wash., Office of Unemployment Compensation, 326 U.S. 310 (1945)). Another way to state the test is whether it would be fair to require a party to defend the action in the forum state. Kulko v. Superior Court of California In and For City and County of San Francisco, 436 U.S. 84, 91 (1978).

As stated by the Court in First American First, Inc. v. National Ass'n. of Bank Women, 802 F.2d 1511, 1515-1516 (4th Cir. 1986):

> The basic principle is of course that the defendant must have "certain minimum contacts" with the forum state and that the exercise of jurisdiction over him "does not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The constitutional interest protected is the individual's liberty interest in not being bound in personam by judgments of a forum with which he lacks meaningful contacts, ties or relations. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 468, 105 S.Ct. 2174, 2180, 85 L.Ed.2d 528 (1985). These minimum contacts cannot have had their source in the "unilateral activity of those who claim some relationship with a nonresident defendant," Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958), but must be found in conduct of the defendant by which he "purposefully avails [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," id.; see also Burger King, 471 U.S. at 475, 105 S.Ct. at 2183. The "purposeful availment" requirement guards against the possibility that a defendant will be haled into a forum solely as a result of "random, isolated, or fortuitous" contacts. Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984). What is sought

-5-

is conduct by the defendant in relation to the forum state "such that he should reasonably anticipate being haled into court there." <u>World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

The amount and type of minimal contacts which will establish jurisdiction may vary considerably depending on whether the cause of action is "related to" or "arises out of" contacts with the forum state. When it does, the court is said to be exercising "specific jurisdiction" and, as a rule, fewer general contacts with the forum state will be necessary because of the more specific intentional contacts. <u>First American</u>, 802 F.2d at 1515. If the cause of action, on the other hand, does not arise or relate to the defendant's contact with the forum state, then personal jurisdiction can only exist as "general jurisdiction." In that instance, far more substantial general contacts will be needed in order to satisfy the fair play required by due process. <u>Id.</u> In such a situation, the contacts are required to be continuous and systematic. <u>Helicopteros</u>, 566 U.S. at 415. In the instant case, Plaintiff does not contend there are sufficient contacts for general jurisdiction, but rather claims specific jurisdiction because of Defendants' Internet activity.

Defendants, for their part, do not contest that North Carolina's long-arm statutes authorize jurisdiction over them and the controversy to the extent due process requirements are met. Those statutes have been construed to extend jurisdiction to the

-6-

Case 1:07-cv-00855-JAB-WWD   Document 23   Filed 11/21/08   Page 6 of 20

full extent allowed by the due process clause. Red Bull GmbH v. RLED,LLC, 515 F. Supp. 2d 641, 647 (M.D.N.C. 2007). As a result,

> the requirements for specific jurisdiction merge and the test focuses on three factors: (1) to what extent did defendants "purposefully avail" themselves of the privileges of conducting activities in North Carolina and thus invoke the benefits and protections of North Carolina law; (2) did plaintiffs claims arise out of those North Carolina-related activities; and (3) is the exercise of jurisdiction constitutionally "reasonable."

Id.(citing Christian Science Bd. of Directors, 259 F.3d at 216).

Technological progress has required a rethinking of what kinds of activity are sufficient to show that a person has purposely availed himself or herself of the benefits and protection of a state's laws. Recent innovations have dramatically increased the flow of information and commerce between states at an unprecedented level. The paradigm example would be the changes brought about by the computer and the Internet. People can instantly communicate with one another all over the world and at enormous volume with relatively little effort. See ALS Scan, Inc. v. Digital Service Consultants, Inc., 293 F.3d 707, 711-712 (4th Cir. 2002). Individuals can create their own websites using servers in other states whereby other people in different states may access the information placed on the website with as little effort as if that person had placed the message on a sign in front of his house where thousands of people drive by from all over the world in an instant. These changes have required adaptation with respect to determining when a state court can assert personal jurisdiction over out-of-state defendants.

As noted by the Court in ALS Scan, if the test of minimum contacts were based on whether a person sent an electronic transmission which was received in another state, then a foreign state's jurisdictional reach would be worldwide or universal. Id. at 713. Finding that day had not yet arrived, the Fourth Circuit constructed a test for determining when the sending and receipt of electronic transmissions amounted to purposeful conduct directed at a state which would satisfy due process concerns for allowing a state to exercise personal jurisdiction over out-of-state individuals. Looking at the test developed in Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997), the Fourth Circuit noted that, in determining whether an individual who maintains a website or uses the Internet has had intentional contact with another state sufficient to satisfy due process, one must consider the vast range of the amount and kind of electronic transmissions. As it stated in ALS Scan, 293 F.3d at 713-714 (quoting Zippo, 952 F. Supp. at 1124):

> At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and

commercial nature of the exchange of information that occurs on the Web site. [internal citations omitted]

Thus, the amount, kind, and level of activity, and whether the activity is commercial or merely the exchange of information, will have a decided impact on whether the Internet activity in question could be the basis for personal jurisdiction.

The Fourth Circuit in <u>ALS Scan</u> adopted and adapted the <u>Zippo</u> test, and set forth its own test, as follows:

> [W]e conclude that a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts. Under this standard, a person who simply places information on the Internet does not subject himself to jurisdiction in each State into which the electronic signal is transmitted and received. Such passive Internet activity does not generally include directing electronic activity into the State with the manifested intent of engaging business or other interactions in the State thus creating in a person within the State a potential cause of action cognizable in courts located in the State.

<u>ALS Scan</u>, 293 F.3d at 714.

In the <u>ALS Scan</u> case, the court found that the host of a website located in Georgia and displaying alleged copyrighted photographs was not subject to personal jurisdiction in the State of Maryland. All that the host did was act as an Internet service provider ("ISP"). It was not the entity that selected and displayed the photographs. The court found that the defendant's role as an ISP was, at most, passive.

-9-

In Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390 (4th Cir. 2003), the Fourth Circuit had another chance to apply the ALS Scan principles. In that case, the trademark in question was "Carefirst." The plaintiff was a Maryland insurance company and alleged that the defendant Care First Pregnancy Centers, Inc. infringed its mark through a web hosting service which contained the "Carefirst" name. The website, among other things, solicited donations, provided educational material, medical references, and promoted counseling services. With respect to donations, the website permitted them to be made by calling a toll free number or by making a credit card donation directly through the website. In ten years, the defendant received $1,542.00, or about 0.0174% of its total donations, from Maryland residents. From this, the court found insufficient personal jurisdiction over the defendant in the State of Maryland.

The court reasoned that the limited use of the website made it "semi-interactive." It acknowledged that the website permitted some user exchange of information with the host computer. But, the more important fact was the limited level of the activity and its non-commercial nature. Carefirst, at 400. First, it found the only concrete evidence of the website being used for a commercial purpose was when plaintiff's counsel made a donation for the purpose of bolstering plaintiff's lawsuit. Moreover, in Carefirst, unlike Zippo, there was little evidence of any commercial transactions. Products were not sold and sent to the State of

-10-

Maryland, nor were there any significant amounts of donations. Rather, because the harm did not involve the sale of a product, but rather the use of a trademark, the court found it significant that the defendant's website had a strongly local character, indicating an intention to reach a local audience, as opposed to a Maryland audience. In that situation, the mere fact that the Internet allowed persons from other states to make a contribution was deemed simply insufficient to sustain personal jurisdiction in a foreign forum. The court acknowledged that, in a trademark infringement case, the place of injury is plainly relevant and that the plaintiff would have felt injury in the State of Maryland. Nevertheless, it emphasized that the injury ultimately must be accompanied by a defendant's own purposeful actions having more than a minimum impact in order for jurisdiction to be asserted. It found insufficient evidence that defendant purposely aimed its activity and trademark usage at Maryland. These principles will be helpful in the present case.

Defendant Optihealth[1] agrees that it sells its products in the State of North Carolina. However, it contends that none of its so-called infringing or offending activities took place in North Carolina. Thus, Defendants maintain that the sale of the goods is

---

[1] Although the Court refers to Defendant Optihealth, the reference also includes Defendant Russell Dickson who is the Chairman or Chief Executive of Optihealth and who has personally injected himself into the affray by the purchase and use of the "www.opc3.com" domain name, as well as by his position in the company. As will be seen next, the Court has personal jurisdiction over both the corporate defendant and the individual defendant, which will be discussed in that order.

not tied to a cause of action for trademark infringement, because none of the products Defendant sends to the State of North Carolina contain or use the trademark. As for purchasing "Sponsored Links" from the search engine Google, Inc. and placing the term "opc3" in the metatags in the computer code, all these activities take place outside of North Carolina. And, while Defendants admit to the purchase and use of the domain name "www.opc3.com," they contend it is a passive website, so that no goods are shipped to North Carolina because of it. Therefore, according to Defendants, because none of the alleged trademark infringing or other activity occurred in the State of North Carolina, they cannot be subjected to jurisdiction here.

The Court cannot agree. Defendants' argument is premised on the proposition that, because it is the customers who initiate the search, Defendants have no connection to that search. This ignores the fact that Defendants engage in a number of activities using Plaintiff's trademark, which is intended to draw individuals to their website, which, in turn, is used to make out-of-state sales. They have done this by purchasing "Sponsored Links" from Google, Inc., wherein, when an Internet user types in the trademark "opc3" or a variation, there will be a greater likelihood that the information seeker will be directed to Defendants' website. Second, they have used the trademark in metatags[2] in their computer

---

[2] For definition of metatags, see North American Medical Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1216 n.2 (11th Cir. 2008).

code for their website for the express purpose of increasing the chance that Internet search engines will point potential customers, including customers from North Carolina, to their website. Furthermore, Defendants have purchased the domain name "www.opc3.com" so that Internet users typing in the "opc3" mark will be directed to Defendants' website and Defendants' competing products. None of these actions are inadvertent choices, but intentional activity seeking to use Plaintiff's trademark in order to draw potential customers of Plaintiff to Defendants' website, where it is intended that some of Defendants' products will be shipped to North Carolina. Moreover, Defendants are not some disinterested third parties who seek merely to provide information on the website. Rather, they are direct competitors which use their websites as a means of directing potential customers of Plaintiff to Defendants' own website in order to sell the very same or similar product. This certainly distinguishes Defendants from the one in Carefirst, 334 F.3d 390.

Defendants attempt to make much of the fact that the Second Circuit, in the case of 1-800 Contacts v. WhenU.Com, Inc., 414 F.3d 400 (2d Cir. 2005), found that the use of metatags did not amount to the use of a trademark. The Fourth Circuit has not decided this issue, but outside of the Second Circuit, the authority is to the contrary. North American Medical Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211 (11th Cir. 2008); Boston Duck Tours, LP v. Super Duck Tours LLC, 527 F. Supp. 2d 205 (D. Mass. 2007)(collecting cases).

Those cases note that the mere fact that a defendant did not visually display the plaintiff's trademark through the use of a metatag is not determinative on the issue of use, but rather is more properly a factor to be used in deciding whether there is a "likelihood of confusion" caused by defendant's activity. This reasoning is persuasive, and the Fourth Circuit likely would find it so. In any event, the Fourth Circuit has not stated that such use of a mark could not constitute trademark infringement. In addition to the intentional use of metatags, there is also Defendants' intentional purchase of sponsor links and their use of the trademark in the "www.opc.com" website, which is the subject of Plaintiff's cybersquatting claim.

Applying the ALS Scan test to these facts allows a finding of jurisdiction over Defendants. The first factor is whether Defendants have directed electronic activity into the State. In that regard, there is no question but that they have done so through their interactive website.[3] In fact, they sell a significant amount of products in this State. Defendants try to minimize this activity by claiming that sales to North Carolina amount to a little under 3% of their revenue. However, considering that Defendants' sales are worldwide and there are fifty states, it turns out that North Carolina is one of Defendants' "better

---

[3] Defendants' argument that they have no infringement activity in North Carolina because they do not send articles bearing Plaintiff's trademarks into the State misses the point. Rather, what is important is their alleged misuse of Plaintiff's marks as a means of generating those sales knowing that the effect of misuse will be felt in North Carolina.

-14-

customers." The fact that the sales only constitute 2.83% of the revenue is not determinative. For example, a company which sold to all fifty states equally would only have 2% of sales in each state and yet, the revenue could well be extremely large. The Court finds the 2.83% of sales to North Carolina to be a factor supporting personal jurisdiction. Additional support lies in the amount of sales, which amounts to $37,154.40 in five years. While this is not a huge yearly amount of sales, neither is it an insignificant amount. Its importance lies more in the fact that it shows that Defendants are not some small itinerant business, but rather an established firm with considerable, continuous sales, and should not be surprised to find themselves in litigation in the State of North Carolina.[4]

Defendants have taken purposeful action with respect to using Plaintiff's trademark in order to encourage potential customers throughout the world, including from North Carolina, to go to Defendants' website and there, purchase Defendants' product, the result of which will be a shipment of some of Defendants' product to the State of North Carolina. In other words, they have taken steps to direct people to their website with the intent of engaging

---

[4]In an instance where such sales actually were insignificant, for example, amounting to a few hundred dollars, that factor arguably should be taken into account when considering a motion to transfer venue. In the instant case, the facts disclose extremely active Defendants selling products throughout the world with a significant amount of revenue whereby they could, at some time, be expected to be in litigation in states other than the one in which they are located as a result of tortious activity. The sales by percentage and by amount show that it would not be unfair to make Defendants litigate this trademark matter in North Carolina.

-15-

Case 1:07-cv-00855-JAB-WWD   Document 23   Filed 11/21/08   Page 15 of 20

in business with persons, including persons within the State of North Carolina.

The final ALS Scan factor is whether the activity creates a cause of action within the State. The Court finds the answer to that question to be in the affirmative with respect to trademark litigation. It is true that shipment of the product into the State does not create the trademark cause of action. However, by using Plaintiff's trademark to capture potential customers from North Carolina, Defendants have engaged in a line of purposeful activity with respect to the trademark. As a result, they can be expected to have anticipated litigation with the company owning the trademark in the state where that company conducts its business –– in this case North Carolina. Bird v. Parsons, 289 F.3d 865, 876 (6th Cir. 2002). It is the combination of Defendants' purchase of an Internet website and search engine links, the use of Plaintiff's trademark in metatags as a means of stimulating Internet sales of their product in North Carolina where Plaintiff is located, and the actual sales into North Carolina, which supplies the basis for jurisdiction and the cause of action here.

In summation, it cannot be said that it would be unfair to require Defendants to defend a trademark action here based on (1) the percentage and amount of sales over a significant period of time in this State, and (2) because Defendants have utilized a number of alleged trademark infringing activities in order to enhance Defendant Optihealth's sales, including significant sales

to residents of North Carolina.  See <u>Audi AG and Volkswagon of America, Inc. v. D'Amato</u>, 341 F. Supp. 2d 734 (E.D. Mich. 2004)(knowledge that the competitor owning the trademark resides in a certain state shows knowledge that the effect will be felt there); <u>see</u> <u>also</u> <u>American Eyewear, Inc. v. Peeper's Sunglasses and Accessories, Inc.</u>, 106 F. Supp. 2d 895 (N.D. Tex. 2000)(use of domain name "peepers.com" to make sales to Texas residents, even though no other use of trademark, is sufficient to establish personal jurisdiction in Texas).  Certainly, it may not be said that Defendants' activities were random, isolated, or fortuitous.  Nor could it be said that a decision requiring Defendants to defend a lawsuit in North Carolina somehow offends the traditional notions of fair play and substantial justice required by <u>International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement</u>, 326 U.S. 310 (1945).

   Defendants did not separately discuss their being amenable to this Court's personal jurisdiction over them.  However, the individual is in the same position as the corporation.  Defendant Dickson has not attempted to invoke the "fiduciary shield doctrine" which holds that acts of corporate officers and employees done on behalf of the corporation do not supply a predicate for asserting personal jurisdiction over them.  <u>Pittsburgh Terminal Corp. v. Mid Allegheny Corp.</u>, 831 F.2d 522, 525 (4th Cir. 1987).  It would have been to no avail in any event, because the Fourth Circuit has held the doctrine to be unavailable where, as here, the state's long arm

-17-

statute is co-extensive with due process. Id. The relevant inquiry is simply the actions taken by the officer or employee. General actions by such persons on behalf of the corporation will not generally subject them to an out-of-state court's jurisdiction, but actions related to the events in question may do so. Glynn v. EDO Corp., 536 F. Supp. 2d 595, 605 (D. Md. 2008). And, even actions taken wholly out of state may not shield a corporate director from a state's long arm statute when directly connected to the issues of a lawsuit. Pittsburgh, supra; Springs Industries, Inc. v. Gasson, 923 F. Supp. 823 (D.S.C. 1996)(collecting cases). In the instant case, Defendant Dickson injected himself into the controversy by maintaining ownership of the domain name "www.opc.com." He was aware of the corporate activity and collaborated in it very directly and personally by his ownership and allowed use of the domain name. The Christian Science Bd. of Directors of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 217 (4th Cir. 2001); see also ePlus Technology, Inc. v. Aboud, 313 F.3d 166 (4th Cir. 2002).

## II. Motion to Transfer

Defendants also request that this action be transferred to New York pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses. As stated in Triad Intern. Maintenance Corp. v. Aim Aviation, Inc., 473 F. Supp. 2d 666, 669 (M.D.N.C. 2006):

> The burden is on defendant to show that transfer is appropriate. Datasouth Computer Corp. v. Three Dimensional

Technologies, Inc., 719 F.Supp. 446, 451 (W.D.N.C. 1989). This Court has previously held that the factors to be considered in making this determination are:

(1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws. Plant Genetic Sys., N.V. v. Ciba Seeds, 933 F.Supp. 519, 527 (M.D.N.C. 1996)(citing Datasouth Computer Corp. v. Three Dimensional Techs., Inc., 719 F.Supp. 446, 450-51 (W.D.N.C. 1989)).

Republic Mortg. Ins. Co. v. Brightware, Inc., 35 F.Supp.2d 482 (M.D.N.C. 1999). "The court should refrain from transferring venue if to do so would simply shift the inconvenience from one party to another." Regent Lighting Corp. v. Galaxy Elec. Mfg., Inc., 933 F.Supp. 507, 513 (M.D.N.C. 1996)(citing Tools USA and Equipment Co. v. Champ Frame Straightening Equipment, Inc., 841 F.Supp. 719, 721 (M.D.N.C. 1993)).

Defendants fail to satisfy their burden. First, they present no evidence in support of their claims. Second, their argued proof is almost entirely conclusory. They assert that the cause of action is based on Defendants' Internet activity occurring outside of the State and, therefore, the source of proof would come from Defendants' records located in New York. Defendants then contend that this Court lacks subpoena power over unwilling foreign residents. However, in this case, it will be Defendants who will be explaining their activities, and they should have sufficient

-19-

control over their employees or contractors in order to minimize, if not eliminate, any burden with respect to the production of witnesses.

Defendants also contend there is no local interest in having the controversy settled in North Carolina. However, this assertion forgets that Plaintiff is protecting the alleged misuse of its trademarks and that harm occurs where Plaintiff is located. Moreover, to the extent that Defendants are unfairly using Plaintiff's trademark to syphon away North Carolina customers, that harm is also felt within this State.

It is true that the factors mentioned above are nonexclusive. <u>Triad Intern.</u>, 473 F. Supp. 2d at 669. However, Defendants have not submitted any other factor or extreme hardship which they would face by having the litigation conducted here. As stated previously, Defendants sell worldwide and have made a not insignificant amount of sales to North Carolina citizens, the alleged misuse activity is extensive, and Defendants' overall sales are extensive. Plaintiff points out this case will likely require little discovery and the burden on Defendants will not be onerous.

**IT IS THEREFORE RECOMMENDED** that Defendants' motion to dismiss for lack of personal jurisdiction or, alternatively, to transfer this case to the appropriate federal court in New York (docket no. 4) be denied.

                                                    */s/ Russell A. Eliason*
                                             **United States Magistrate Judge**

November 21, 2008